F I L E D
Clerk
District Court

MAY 30 2023

for the Northern Mariana Islands
By_____
(Deputy Clerk)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN MARIANA ISLANDS**

JOSHUA GRAY,

Plaintiff,

v.

IMPERIAL PACIFIC INTERNATIONAL
(CNMI), LLC,

Defendant.

CASE NOS. 1:19-cv-00008 and
1:19-cv-00020

**DECISION AND ORDER GRANTING**
**DEFAULT JUDGMENT**

## I.     INTRODUCTION AND PROCEDURAL HISTORY

Plaintiff Joshua Gray filed his Second Amended Complaint ("SAC") against Defendant Imperial Pacific International (CNMI), LLC ("IPI") alleging wrongful termination in violation of public policy and 42 U.S.C. § 1981, and requesting actual and punitive damages. (SAC 5-7, ECF No. 19.) The Court consolidated the instant case with a related case, *Gray v. Imperial Pacific International (CNMI), LLC*, 1:19-cv-00020. (Order Consolidating Cases, ECF No. 26.) In that case, Gray alleged IPI discriminated and retaliated against him in violation of Title VII of the Civil Rights Act of 1964 and requested actual damages. (Title VII Compl., ECF No. 1 *in* 1:19-cv-00020.)

Previously, the Court issued a memorandum decision on entry of default pursuant to Federal Rule of Civil Procedure 37 ("Mem. Decision") against IPI that explained its rationale for entering default as a contempt finding for IPI's repeated discovery violations. (Mem. Decision 1, ECF No. 138.) IPI subsequently moved to vacate the entry of default, which the Court conditionally granted. (Decision and Order, ECF No. 146.) Ultimately, IPI proved unable to satisfy its discovery

obligations; therefore, the Court denied IPI's motion to set aside the entry of default such that the entry of default (ECF No. 81) remained. (Order on Entry of Default 4, ECF No. 165.)

Gray thereafter filed a memorandum in support of his motion for default judgment (Mot., ECF No. 177) supported by his declaration (Gray Decl., ECF No. 178) along with exhibits (ECF Nos. 178-1 – 178-2), the Declarations of Roger Pich (ECF No. 179), Reyshell Anne Avellanoza (ECF No. 180), Danny Ewing (ECF No. 181), Tim Goodwin (ECF No. 182), Bruce Berline (First Berline Decl., ECF No. 183) also with exhibits (ECF Nos. 183-1 – 183-3), Sanford L. Drob, PhD (ECF No. 184), Anthony K Bird, MA, CRC (ECF No. 185), and a Report of Nik Volkov (ECF No. 186). Gray requests $3,939,768 in compensatory damages with a ratio of 7:1 for punitive damages, which amounts to $31,518,144 in total damages. (Mot. 53.) IPI filed its memorandum in opposition (Opp'n, ECF No. 200) supported by the Declaration of Redie Dela Cruz (First Dela Cruz Decl., ECF No. 200-1). Gray filed his reply brief (Reply, ECF No. 203) supported by another Declaration of Bruce Berline (Second Berline Decl., ECF No. 204) with more exhibits (ECF Nos. 204-1 – 204-13). After the Court permitted IPI an opportunity to file supplemental briefing on causation (Mins. 1, ECF No. 211), IPI filed a sur-reply (ECF No. 177) with a Declaration of Howyo Chi (ECF No. 213)[1] and another Declaration of Redie Dela Cruz (Second Dela Cruz Decl., ECF No. 214) with exhibits (ECF No. 214-1).[2] With the Court's permission (ECF No. 211), IPI filed a sur-reply (Sur-Reply, ECF No. 215). The Court accepted the parties' stipulation admitting certain exhibits into evidence. (Mins. 1, ECF No. 221.)

---

[1] At the hearing on default judgment, the Court sustained Gray's objection to Chi's declaration and testimony because IPI failed to disclose Chi as a witness in its initial disclosures. (Mins. 1, ECF No. 221.) As such, the Court did not consider Chi's declaration for purposes of this decision and order.

[2] At the hearing, the Court overruled Gray's objection to considering Dela Cruz's declarations. (Mins. 1, ECF No. 221.)

A hearing on the motion for default judgment was held on November 30, 2022 wherein the Court took the matter under advisement. (*Id.* at 2.) Having reviewed the record, evidence presented, and relevant case law, the Court GRANTS Gray's motion for default judgment, but for the lesser amount of **$5,686,182.20** plus attorneys' fees and costs, prejudgment interest, and post-judgment interest at the applicable federal rate.

## II.  FACTUAL BACKGROUND

The numerous facts detailed below are taken as true from the SAC and the Title VII complaint since default was entered. *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987). Other facts are established based on the admissible evidence presented during the briefing on the motion and at the motion hearing.

### A.  Gray's Employment at IPI

Gray moved to Saipan and began working for IPI in September 2015 as the Director of Operations. (Title VII Compl. ¶ 12; Gray Decl. ¶ 11, ECF No. 178.) Less than a year later in July 2016, Gray filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging that IPI discriminated against qualified U.S. citizens in favor of foreign workers. (Title VII Compl. ¶ 31(a); Gray Decl. ¶¶ 24, 34.) One of Gray's allegations was that IPI had declined to hire Gray for the position of Assistant Vice President of Hotel Operations despite Gray's qualifications because IPI had already recruited and offered the job to Calvin Wong, "a racially Asian/ethnically Chinese individual[.]" (*See* Title VII Compl. ¶ 31(a); Gray Decl. ¶ 21.) Ten months later, Gray and IPI settled the 2016 EEOC claim. (Title VII Compl. ¶ 31(c).) Per the settlement, Gray became "Assistant Vice President – Front Office" with a salary equivalent to Calvin Wong. (*See* Gray Decl. ¶ 41.)

### B.  IPI's Treatment of Gray After EEOC Settlement

Even after he settled his EEOC complaint, Gray continued to feel marginalized; for

3

example, he would not be invited to inter-departmental meetings concerning his responsibilities. (*Id*. ¶ 45.) Additionally, he was assigned to the "half-baked" "Saipan Star" project of bringing a cruise ship to Saipan that was untenable from the start. (*Id*. ¶ 42.) At one point, Gray was the only hotel executive in Saipan, yet issues with hotel operations were directed to the Senior Vice President of Human Resources, Marco Teng. (*Id.* ¶¶ 44-45.)

In November 2017, although Plaintiff was placed on a list of IPI employees to be terminated, then-Chief Executive Officer Mark Brown was able to prevent the termination by speaking to the senior vice president of human resources. (Title VII Compl. ¶ 31(e); Gray Decl. ¶¶ 43-44.)

Gray spoke to Kelly Butcher, IPI's legal counsel who is African American, about his perceived marginalization. (Gray Decl. ¶¶ 29, 47.) Gray was "extremely hurt and insulted" when Butcher told him "to stop being a 'cry baby[.]'" (*Id.* ¶ 47.)

In September 2018, Gray was disheartened and embarrassed when he learned that he had been left out of the planning for IPI's Marianas Resort project, which he had looked forward to working on. (*Id.* ¶¶ 48-49.) The next month, IPI began giving away Gray's responsibilities to Lucy Guo, "an Asian/Chinese individual who had no experience in 5-star hotel operations and who was brought in on a CW-1 visa[,]" which further added insult. (*Id.*¶ 50.) During the 2018 holiday season, Gray learned that he was once again placed on a list of IPI employees to be terminated. (Title VII Compl. ¶ 31(i); Gray Decl. ¶ 51.) For the holidays, Gray flew home to Las Vegas to spend time with his children – he "always tried to make the holidays special by taking them to nice restaurants and staying together in a hotel." (Gray Decl ¶ 51.) But his potential termination plagued him as he "vividly remember[ed] the despair [he] felt knowing that if [he] was fired, [he] would not be able to continue providing these types of experiences for them." (*Id.*)

On January 20, 2019, Gray met with IPI executives Mark Brown, Don Hallmark, and Mark

Badal. (*Id.* ¶ 52.) Brown told Gray that Mr. Ji, IPI's owner, asked "why is the fat black guy still here?" and told Brown to fire Gray. (*Id.*, Title VII Compl. ¶ 31(j); SAC ¶ 24.) Mr. Ji said that Lucy Guo, a non-U.S. citizen of Chinese descent, would handle hotel operations. (Title VII Compl. ¶ 31(j); SAC ¶ 24.) Brown explained to Gray that he informed Mr. Ji that IPI needed Gray's experience for IPI's villas and the Marianas Resort project, and that "it was illegal to fire a U.S. citizen and give his job duties to a CW-1 worker[.]" (Gray Decl. ¶ 53; *e.g.,* SAC ¶¶ 23-24; Title VII Compl. ¶ 31(j).) "To [his] absolute shock, [Gray] later discovered that phrase would also be jokingly circulated in internal chat messages between IPI's in-house lawyers[.]" (Gray Decl. ¶ 52 n.3 (citing text messages).) Gray equates the phrase "fat black guy" to "the N-word." (*Id.* ¶ 52.)

Despite Brown's warning to Mr. Ji about the illegality of Gray's termination, Gray was terminated on January 24, 2019. (SAC ¶¶ 25-26; Gray Decl. ¶ 54.) IPI's Senior Vice President of Operations at the time, Donald Browne, acknowledged that IPI was discriminating against Gray in violation of federal law regarding Gray's unsuccessful applications of vice president of hotel operations and assistant vice president. (Gray Decl. ¶ 24.) In reference to an email where Browne noted a different "foreign worker [was] selected over an equally or more highly qualified US worker[,]" Butcher acknowledged that IPI "ha[d] a similar situation with Joshua Gray." (ECF No. 178-2 at 37.)

After working for IPI for over three years and at the time of his termination, Gray's annual salary was $155,000, and included twenty days of paid vacation, along with fringe benefits including: one meal a day; a two-bedroom apartment at Flame Tree Villa, Vestcor Village; health and dental insurance; and two round-trip first-class tickets to Las Vegas from Saipan. (Gray Decl. ¶ 68.) After Gray's termination, IPI paid Gray an additional three months' salary and his unused vacation time and allowed Gray to stay in IPI housing during those three months. (*Id.* ¶ 69.)

In July 2019, Gray filed another EEOC charge against IPI and received his EEOC right to

sue letter that same month. (Title VII Compl. ¶¶ 31-32.)

In January 2020, IPI had fifty-nine hotel operations employees. (ECF No. 204-9.) But IPI has not had casino or hotel operations since March 2020 because of the COVID-19 pandemic. (First Dela Cruz Decl. 1-2, ECF No. 200-1.) As a result of the pandemic, IPI has furloughed 98% of its employees and laid off others such that currently it only has ten employees. (*Id.* ¶ 5.) Dela Cruz specified that in March of 2020, IPI's then-Chief Financial Officer Ed Chen

> instructed IPI's non-gaming department heads to keep active only essential employees. This meant only employees necessary (1) to secure properties and assets (primarily security and surveillance employees), (2) to prepare employee meals as required for the remaining active employees or under IPI's construction contracts, (3) to maintain IPI's facilities, and (4) to reduce as much as possible the HR, Finance, and Legal functions while allowing the company to continue operating.

(Second Dela Cruz Decl. ¶¶ 22, 24, ECF No. 214.) To date, IPI has not resumed operations. (*Id.* ¶ 30.)

**C. Gray's Efforts to Obtain Similar Employment and His Reputation**

Gray has expended considerable effort in seeking a position in hotel management, both in Saipan and in the continental United States, to no avail. (*See* Gray Decl. ¶¶ 70-73.) He has "either formally applied for a position, sent in [his] resume, or at least informally inquired about a job at every hotel on Saipan." (*Id.* ¶ 72.) For example, in June 2019, Gray applied for the position of hotel manager for Surfrider Hotel. (*Id.* ¶ 71.) Most recently, he applied to work for Crowne Plaza Resort. (*Id.*)

Prospective employers that have interviewed Gray have questioned him about this instant litigation. (*Id.* ¶ 79.) A recruiter informed Gray that because all prospective employers will Google him and discover the lawsuit, Gray should consider a career change. (*Id.*) Vocational rehabilitation counselor Anthony K. Bird, who has over 41 years' experience, explained that Gray's employability has decreased for numerous reasons, including recruiters' reluctance to assist

individuals like him when there are dozens of other candidates with blemish-free reputations. (Bird Decl. 1, 6-8.)

Since his termination, Gray has had sporadic and temporary jobs with salaries far less than what he was earning while at IPI. (*See* Gray Decl. ¶¶ 76-78.) From November to December 2019, he worked as a temporary consultant for a small hotel project and earned $9,576.90. (*Id.* ¶ 76.) From January 2020 through September 2020, Gray earned $ 16,253.73 as a part-time crew leader for the United States Census. (*Id.* ¶ 77.) During the pandemic, Gray also received COVID-related unemployment benefits totaling $10,140. (*Id.*) Since January 2021, Gray has worked as a project manager at Allied Pacific Environmental Consulting, which pays $18 an hour. (*Id.* ¶ 78.)

**D.  Emotional Distress**

Reyshell A. Avellanoza met Gray in April 2016, and gave birth to their daughter in May 2017. (Avellanoza Decl. ¶¶ 1, 13.) She described Gray as energetic, social, "generally always happy, even jolly, and good to people" prior to IPI's discrimination and retaliation. (*Id.* ¶¶ 1, 3-4.) She, as well as Gray's co-worker, Roger Pich, described Gray as always happy and excited to talk about his children - he previously spoke to his family and kids every weekend. (*Id.* ¶ 12; Pich Decl. ¶ 4.)

After his termination on January 24, 2019, Gray experienced, and continues to experience emotional distress. (Gray Decl. ¶¶ 54, 81.) He would be crying one moment then trembling with anger. (*Id.* ¶ 81.) Gray admits to becoming angrier, moodier, and more short-tempered, coping by drinking alcohol and over-eating to dull the pain and anxiety. (*Id.*) He has gained over fifty pounds and has had to take medication to lower his blood pressure. (*Id.*) Gray has lost interest in sex and intimacy, which strained his relationship with Avellanoza. (*Id.* ¶ 83.) His relationship with his three children in the United States has also deteriorated because he is ashamed that he was fired and unable to provide for them. (Gray Decl. ¶ 83; Pich Decl. ¶ 10.) Gray struggles to even provide for

himself, and his financial struggles causes him headaches and frequent panic attacks. (Gray Decl. ¶ 84; Avellanoza Decl. ¶ 16.)

Pich and Avellanoza attested to the emotional toll IPI has caused Gray.[3] Gray stopped barbecuing, a hobby he enjoyed. (Avellanoza Decl. ¶¶ 4, 14; Pich Decl. ¶¶ 3, 12.) Pich noted that after June 2016, he noticed Gray become short-tempered, confrontational, moody, depressed, and temperamental. (Pich Decl. ¶ 8, 10.) Further, Pich commented that Gray "still talks about IPI's discrimination frequently, and [he] can tell [Gray] is still suffering emotionally from the whole experience." (*Id.* ¶ 13.) Avellanoza observed Gray change during the summer of 2016 as he became more irritable, silent, and serious. (Avellanoza Decl. ¶ 5.) He began talking and screaming in his sleep. (*Id.* ¶ 6.) Avellanoza noted that around the fall of 2016, Gray's "personality changed drastically" as he was always mad, and they would argue more often. (*Id.* ¶¶ 8-9.) He always seemed tired, irritable, and angry. (*Id.* ¶ 9-13.) Ultimately, Gray and Avellanoza "separated around January 2018 because [Gray] was just too hard to get along with. He was not the man that [she] had first met." (*Id.* ¶ 15.) Avellanoza described Gray as a once "joyful man, the life of the party, who was always positive and had a big smile for everyone; the generous friend and loving father" who "became a broken man—he lost the career that he loves, but also lost his self-confidence, and his financial, emotional and mental health." (*Id.* ¶ 17.)

After conducting a psychological evaluation, Dr. Sanford L. Drob, Ph.D., concluded "Gray experienced a severe and protracted depressive reaction to the events leading up to his termination at IPI" that "continued and worsened after his termination[.]" (Drob Decl. ¶ 49.)

> As a result of the events at IPI and his job termination he experienced profound depression, severe anxiety, spells of crying and trembling, a sense of personal embarrassment and humiliation, interpersonal and social isolation, sleep difficulties, over-eating and weight gain, increased alcohol consumption leading to hangovers and headaches, loss of sexual interest, disruption in his romantic relationships, social

---

[3] Gray states that it is "extremely difficult and humiliating to need to ask [his] close friend, Roger, and [his] former girlfriend, Anne, to confirm all of these facts in writing." (Gray Decl. ¶ 87.)

isolation, interpersonal mistrust, reduced motivation and energy, extreme moral outrage, temper outbursts, and feelings of guilt over the fact that he could no longer live up to what he perceived to be his interpersonal and parenting responsibilities.

(*Id.*) Dr. Drob states that Gray "continues to experience clinically significant depression, anxiety and other psychological symptoms, as well as a protracted and ongoing crisis in personal identity, self-regard, and self-worth." (*Id.*) Gray "even thought about ending [his] life[.]" (Gray Decl. ¶ 85.)

## III.  LEGAL STANDARD

Under Federal Rules of Civil Procedure 55(b)(2), the court has discretion to enter default judgment following an entry of default. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980) (per curiam). The Ninth Circuit has set forth the following factors ("*Eitel* factors") for courts to consider in exercising their discretion:

(1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986). This Court has already considered the Ninth Circuit's factors for harsh Rule 37 sanctions when it concluded that default was appropriate. (Mem. Decision 10-13, ECF No. 138.) "[I]t would either be redundant or inconsistent to apply *Eitel*'s discretionary factors where default is imposed as a sanction" when the Court has already determined that default was appropriate under the test for Rule 37 sanctions. *Dreith v. Nu Image, Inc.*, No. CV 05–4146, 2007 U.S. Dist. LEXIS 104619, at *18, 2007 WL 9658786, at *6 (C.D. Cal. Mar. 2, 2007); *e.g., Wang v. Gold Mantis Constr. Decoration (CNMI), LLC*, No. 1:18-CV-00030, 2021 U.S. Dist. LEXIS 99966, at *11, 2021 WL 2065398, at *4 (D. N. Mar. I. May 24, 2021).

After default has been entered, the court must determine whether the allegations in the complaint establish liability before entering default judgment. *HTS, Inc. v. Boley*, 954 F. Supp. 2d

927, 947 (D. Ariz. 2013); *see also Hester*, 687 F.3d at 1171; *Wang*, 2021 U.S. Dist. LEXIS 99966, at *12, 2021 WL 2065398, at *4.

> "[N]ecessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir.1992) (citing *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir.1978)); *see also DIRECTV, Inc. v. Hoa Huynh*, 503 F.3d 847, 854 (9th Cir. 2007) (for default judgment purposes, a defendant is not held to admit facts that are not well-pled or conclusions of law); 10A Wright, Miller & Kane, *Federal Practice and Procedure*: Civil 3d § 2688, at 63 (1998) (the court must "consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law").

*HTS, Inc.*, 954 F. Supp. 3d at 947; *see also RingCentral, Inc. v. Quimby*, 711 F. Supp. 2d 1048, 1058 (N.D. Cal. 2010) (citing *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)) ("liability is not established by virtue of the defendant's default"). "The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *TeleVideo Sys., Inc.*, 826 F.2d at 917-18.

Although default has been entered, a plaintiff must prove by a preponderance of the evidence its entitlement to damages. *Beijing Abace Biotechnology Co. v. ADV Biolabs, Inc.*, No. CV 18-3599, 2020 U.S. Dist. LEXIS 159403, at *20, 2020 WL 13588367, at *7 (C.D. Cal. Aug. 24, 2020) (citations omitted); *e.g., Branstetter v. Lorenzo*, No. 20-00573, 2022 U.S. Dist. LEXIS 63934, at *10, 2022 WL 1037198, at *4 (D. Haw. Mar. 14, 2022) (citation omitted), *report and recommendation adopted*, No. CV 20-00573, 2022 WL 1037085 (D. Haw. Apr. 6, 2022). A defaulting party has the ability to contest the amount of damages. *See Ornstein v. Canites*, No. 18-cv-01616, 2018 U.S. Dist. LEXIS 162129, at *5-6, 2018 WL 4538784, at *2 (N.D. Cal. Sep. 21, 2018); *Tripharma, LLC v. First Fruits Bus. Ministry*, No. SACV 12-404, 2013 U.S. Dist. LEXIS 198524, at *9 n.9, 2013 WL 12129386, at *4 n.9 (C.D. Cal. Apr. 2, 2013); *In re Salomon*, No. SC-07-1290 2008 Bankr. LEXIS 4681, at *19, 2008 WL 8449611, at *7 (B.A.P. 9th Cir. June 27, 2008) (citing 49 C.J.S. *Judgments* § 223 (2008)) (defendant in default "*may*, in a proceeding for the

assessment of damages, *offer evidence in mitigation or reduction of the damages* claimed by plaintiff").

The Federal Rules do not require that testimony be presented as a prerequisite to the entry of a default judgment. *See* Fed. R. Civ. P. 55(b)(2) (noting that the court "may" conduct hearings). However, "[i]t is well settled that a default judgment for money may not be entered without a hearing unless the amount claimed is a liquidated sum or capable of mathematical calculation." *Davis v. Fendler*, 650 F.2d 1154, 1161 (9th Cir. 1981) (citation omitted). The moving party "need not submit voluminous evidence to support a claim for damages; a declaration or affidavit from the plaintiff describing the factual allegations that support a damages award will suffice." *Barbee v. DNSPWR2 LLC*, No. CV-20-08100, 2020 U.S. Dist. LEXIS 210069, at *11, 2020 WL 6585666, at *4 (D. Ariz. Nov. 4, 2020) (citing *Vogel v. Rite Aid Corp.*, 992 F. Supp. 2d 998, 998 (C.D. Cal. 2014), *abrogated on other grounds by Lopez v. Catalina Channel Express, Inc.*, 974 F.3d 1030 (9th Cir. 2020)).

## IV.   DISCUSSION

### A.  *Eitel* Factors

Although consideration of the *Eitel* factors is extraneous when the Court has already imposed the Rule 37 sanction of entry of default, the undersigned ultimately finds that the *Eitel* factors weigh in favor of default judgment.

### i.  Possibility of Prejudice to Plaintiff

The first *Eitel* factor considers whether the "plaintiff will suffer prejudice if default judgment is not entered." *Vogel*, 992 F. Supp. 2d at 1007 (citation omitted). Here, Defendant's failure to produce the requested discovery, despite being afforded numerous opportunities to do so, prejudices Gray's ability to collect evidence because Defendant's personnel are leaving and/or being furloughed. (Mem. Decision 12, ECF No. 138.) Defendant's extensive delay warrants a

finding of prejudice to Plaintiff. This action has been pending since April 2019. This case is at a standstill, and any further delay would be prejudicial to Plaintiff.

### ii. Merits of Plaintiff's Claim and Sufficiency of the Complaints[4]

Gray's causes of action are wrongful termination in violation of public policy, a violation of 42 U.S.C. § 1981, and violations of Title VII for status-based discrimination and retaliation-based discrimination. The Court will address the merits of each claim in turn. "The Ninth Circuit has suggested that the first two *Eitel* factor[s]—involving the substantive merits of Plaintiff's claims and the sufficiency of the complaint—'require that plaintiff's allegations state a claim on which they may recover.'" *Discovery Commc'ns, Inc. v. Animal Planet, Inc.*, 172 F. Supp. 2d 1282, 1288 (C.D. Cal. 2001) (citations omitted).

### a. 42 U.S.C. § 1981 and Title VII Discrimination

"To establish a claim under § 1981 the plaintiff must prove that he or she was subjected to intentional discrimination based upon his or her race, rather than solely on the basis of the place or nation of their origin or their religion." *Pavon v. Swift Transp. Co., Inc.*, 192 F.3d 902, 908 (9th Cir. 1999). A complaint alleging a § 1981 violation does not need to plead a prima facie case of discrimination as "only 'a short and plain statement of the claim showing that the pleader is entitled to relief'" is required. *Maduka v. Sunrise Hosp.*, 375 F.3d 909, 911-12 (9th Cir. 2004) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002). To state a claim under § 1981, "a plaintiff must allege that, 'but for race,' they 'would not have suffered the loss of a legally protected right.'" *Christian v. Rancho Grande Manufactured Home Cmty.*, No. 21-cv-07040-VC, 2022 U.S. Dist. LEXIS 109716, at *2, 2022 WL 2206899, at *1 (N.D. Cal. June 21, 2022) (quoting *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020)). The plaintiff "must

---

[4] At the hearing, IPI conceded that it did not contest the sufficiency of the complaints. (Mins. 2, ECF No. 221.)

plead 'sufficiently, nonconclusory allegations plausibly linking the [adverse] action to discrimination' on the basis of race." *Id.* (quoting *Austin v. Univ. of Or.*, 925 F.3d 1133, 1138 (9th Cir. 2019)).

In his second amended complaint, Gray alleges that IPI had a discriminatory policy of hiring Asians and rejecting other candidates because they were not Asian. (*See* SAC ¶¶ 12, 26.) In accordance with such discriminatory practices, Gray claims that IPI significantly diminished his material responsibilities, demoted him, and then terminated him. (*Id.* ¶ 36.) Gray alleged various facts in support of this – he was assigned to work on the floating hotel, which was never feasible; IPI's legal counsel dismissed his complaints of significant diminished material responsibilities; IPI's owner informed a senior executive that he wanted Plaintiff (who he referred to as the fat black guy) terminated and that a Chinese woman, Lucy Guo, could replace him; and his ultimate termination on January 24, 2019. (*Id.* ¶¶ 19-26.) Further, Gray maintains that he was terminated because he is African American and a U.S. citizen, which is supported by IPI's aforementioned "pattern and practice of rejecting qualified U.S. applicants in favor of applicants from Asian countries." (*Id.* ¶¶ 30, 36.) Based on the foregoing, the Court finds that the second amended complaint plausibly alleges Gray was racially discriminated against in violation of § 1981. (*See* Order on Mot. Dismiss First Am. Compl. 6-7, ECF No. 18.)[5]

Based on this conclusion, the Court also finds that the complaint in the consolidated case sufficiently states a claim for Title VII discrimination. *See Lowe v. City of Monrovia*, 775 F.2d 998, 1010 (9th Cir. 1985), *amended*, 784 F.2d 1407 (9th Cir. 1986) (citation omitted) (noting that the same standards are used to prove claims of disparate treatment under § 1981 and Title VII, thus "facts sufficient to give rise to one are sufficient to give rise to the other").

---

[5] Previously, the Court found that Gray had "alleged sufficient facts to state a claim for relief under § 1981" in his first amended complaint based on the same set of facts. (Order 7, ECF No. 18.)

13

1    **b.  Title VII Retaliation**

2        While a plaintiff is not required to plead a prima facie case of retaliation for his or her

3    complaint to be adequate, "courts still look to the elements of the prima facie case 'to decide, in

4    light of judicial experience and common sense, whether the challenged complaint contains

5    sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face.'"

6    *Hicks v. Netflix, Inc.*, 472 F. Supp. 3d 763, 771 (C.D. Cal. 2020) (quoting *Cloud v. Brennan*, 436

7    F. Supp. 3d 1290, 1301 (N.D. Cal. 2020)). Nevertheless, if "a plaintiff pleads a plausible prima

8    facie case, the complaint sufficiently states a claim." *Cloud*, 436 F. Supp. 3d at 1300 (citing

9    *Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1050 n.2 (9th Cir. 2012)). To establish a prima

10   facie case of retaliation, a plaintiff must claim that he or she: 1) engaged in protected activity, 2)

11   was subjected to an adverse employment action, 3) the employer enacted the adverse employment

12   action because the plaintiff engaged in protected activity. *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793,

13   796 (9th Cir. 1982) (citations omitted). Filing a charge with the EEOC constitutes engaging in

14   protected activity. *Van Pelt v. Skolnik*, 897 F. Supp. 2d 1031, 1044 (D. Nev. 2012), *aff'd sub nom.*

15   *Van Pelt v. Nevada, ex rel. Nev. Dep't of Corr.*, 637 F. App'x 307 (9th Cir. 2016) (finding that

16   plaintiff engaged in protected activity when she filed an EEOC complaint). Termination is an

17   adverse employment action. *Id.* "To establish a causal connection between her protected activity

18   and the adverse actions, a plaintiff may allege direct or circumstantial evidence from which

19   causation can be inferred, such as an employer's 'pattern of antagonism following the protected

20   conduct[.]'" *Cloud*, 436 F. Supp. 3d at 1301 (quoting *Porter v. Cal. Dep't Corr.*, 419 F.3d 885, 895

21   (9th Cir. 2005)).

22       Here, Gray pleads a prima facie case of retaliation in violation of Title VII. First, he states

23   that he filed a charge with the EEOC in July of 2016 (Title VII Compl. ¶ 31(a)), which constitutes

24   protected activity. Second, Gray asserts that he was subsequently terminated (*id.* ¶ 28), which is an

14

adverse employment action. Third, Gray listed numerous hostile actions IPI employees took against him after he filed his EEOC charge, which shows a "pattern of antagonism." (*Id.* ¶ 31.) For example, he was put on a list to be terminated, excluded from meetings, demoted, and ignored. (*Id.*) Therefore, the Court finds that Gray has sufficiently plead a claim of retaliation under Title VII.

### c. Wrongful Termination in Violation of Public Policy

Previously, the Court used to the Restatement of Employment Law to recognize the tort of wrongful discharge in violation of public policy.[6] (Order on Mot. Dismiss First Am. Compl. 4-5). "Claims for wrongful termination in violation of public policy do not need to meet a heightened pleadings standard; they are governed by Rule 8(a)'s notice pleading standard" and must then "provide fair notice of the claims so that a defendant can effectively respond." (*Id.* at 5 (first citing *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1100 (9th Cir. 2008); and then citing *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).) "To state a claim for wrongful discharge in violation of public policy, an employee must show: (1) The existence of a relevant public policy; (2) that he was engaged in conduct favored by public policy; (3) that the employer knew or believed that the employee was engaged in a protected activity; (4) that retaliation was a motivating factor in the dismissal decision; (5) that the discharge would undermine an important public policy." *Chung v. World Corp.*, No. CV-04-0001-ARM, 2005 WL 1459674, at *4 (D. N. Mar. I. June 22, 2005) (citing 82 Am.Jur.2d Wrongful Discharge § 55 (2003)). As the Court previously noted, "[t]o state a claim for wrongful termination in violation of public policy, the Restatement requires the public policy be grounded in statute or another source." (Order on Mot. Dismiss First. Am. Compl. 5.) Employment discrimination based on race undeniably violates public policy. *See Wei Zhang v.*

---

[6] In the Commonwealth of the Northern Mariana Islands, "the rules of common law, as expressed in the restatements of the law approved by the American Law Institute . . . shall be the rules of decision in the courts of the Commonwealth, in the absence of written law or local customary law to the contrary[.]" 7 CMC § 3401.

*Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 4043 (9th Cir. 2003) ("Freedom from discrimination on the basis of race or ethnicity is a fundamental human right . . . and the intentional deprivation of that freedom is highly reprehensible conduct.").

In his second amended complaint, Gray identified the public policy opposed to race-based discrimination and references several statutes as the basis for such policies including a Commonwealth law at 3 CMC § 4521, and federal law at 8 U.S.C. § 1324b, and 18 U.S.C. §§ 2, 1001, 1546, 1622. (SAC ¶¶ 12, 13 26.) Additionally, because this case has been consolidated with his Title VII complaint, Title VII may also serve as the basis for the public policy. *See Rains v. Criterion Sys., Inc*., 80 F.3d 339, 346 (9th Cir.1996)) (assuming that Title VII is a source of public policy supporting state law claim of wrongful termination in violation of public policy); *accord Phillips v. St. Mary Reg'l Med. Ctr.*, 116 Cal. Rptr. 2d 770, 782 (Cal. Ct. App. 2002) (citations omitted) ("Title VII[] may supply an alternative public policy basis for a wrongful termination claim"). Based on his allegations regarding Title VII, Gray has adequately plead his claim of wrongful discharge in violation of public policy. Gray claims that he filed his initial EEOC complaint in 2016, (Title VII Compl. ¶ 14), which satisfies the element of engaging in protected activity when he stated he filed his EEOC complaint. *See also* Restatement of Employment Law § 5.02(c). Further, Gray alleges IPI knew of his engagement in protected activity and retaliated against him because of such activity. (*See* Title VII Compl. ¶¶ 15, 31.) Finally, Gray asserts that he was terminated in 2019 in violation of the aforementioned public policy. (*Id.* ¶ 28.) Because the Court finds that Gray's claim of wrongful termination in violation of public policy is adequately plead based on his Title VII retaliation claim, the Court declines to address the sufficiency of this claim premised on 3 CMC § 4521, 8 U.S.C. § 1324b, and 18 U.S.C. §§ 2, 1001, 1546, 1622.

//

/

#### d.  Causation

The parties dispute whether evidence of causation for liability and damages is required at this stage where default has already been entered. IPI asserts that back and front pay should be denied since Gray has not "rebut the evidence in the record that his firing was for non-discriminatory, economic reasons." (Opp'n 14-15.) Gray rebuts that "IPI's default means that Gray's well-pleaded allegations are accepted as true, Gray's 2019 termination is established as illegal discrimination, IPI's defenses to liability [including its causation argument] are waived, and Gray is thus entitled to an award of back pay." (Reply 11.)

To clarify, the Court distinguishes between "but for" cause and proximate cause. "'But for' cause 'exists if the defendant's act helped cause the final result and if that result would not have happened without the defendant's act.'" *Katt v. Riepe*, No. CV-14-08042-PCT-DGC, 2015 U.S. Dist. LEXIS 83345, at *27, 2015 WL 3935354, at *11 (D. Ariz. June 26, 2015), *on reconsideration in part*, No. CV-14-08042-PCT-DGC, 2015 U.S. Dist. LEXIS 100436, 2015 WL 4603231 (D. Ariz. July 31, 2015) (citation omitted). Conversely, "proximate cause of an injury is that which, in a natural and continuous sequence, unbroken by an efficient intervening cause, produces an injury, and without which the injury would not have occurred." *Id.* (citation omitted). "An original actor may be relieved from liability for 'the final result when, and only when, an intervening act of another was unforeseeable by a reasonable person in the position of the original actor[.]'" *Id.* (citation omitted). Here, Gray does not need to provide evidence of "but for" causation because the facts, which are taken as true because default has been entered, adequately state a claim for which relief can be granted, including "but for" cause. Additionally, because "proximate cause is properly alleged in the complaint[s], it is admitted upon default." *Philip Morris U.S.A. Inc. v. Castworld Prods.*, 219 F.R.D. 494, 498 (C.D. Cal. 2003) (citing *Greyhound Exhibitgroup, Inc. v. E.L.U.L Realty Corp.*, 973 F.2d 155, 159 (2d Cir. 1992)).) Specifically, Gray asserts that he was terminated

because he is African American and a U.S. citizen, and because he complained of IPI's violation of immigration laws and filed an EEOC complaint. (FAC ¶¶ 30, 36, Title VII Compl. ¶¶ 42, 47-48.) Gray claims that because of IPI's unlawful discrimination, termination, and retaliation, he suffered, and continues to suffer, from lost wages and emotional distress. (FAC ¶¶ 32, 37.)

As explained above, a party in default may contest the amount of damages. The employer that engaged in discriminatory conduct "is entitled to show that other factors contributed to the plaintiff's damage." *Fritsch v. City of Chula Vista*, 196 F.R.D. 562, 568 (S.D. Cal. 1999) (citations omitted). For instance, a "party seeking to limit its liability for back pay" can reduce the back pay award by demonstrating that the wrongfully terminated employee would have been terminated "for a reason unrelated to the unlawful conduct of the employer" but must prove "by clear and convincing evidence the date on which plaintiff's employment would have terminated." *Ackerman v. W. Elec. Co.*, 643 F. Supp. 836, 854 (N.D. Cal. 1986), *aff'd*, 860 F.2d 1514 (9th Cir. 1988). Therefore, IPI may introduce evidence of an intervening act that would break the chain of causation such that its liability is limited. But the Court reiterates that Plaintiff need not provide evidence as to causation to establish liability. *See TeleVideo Sys., Inc.*, 826 F.2d at 917–18 ("The general rule of law is that upon default the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true.").

Because the Court finds that the complaints adequately allege claims of a § 1981 violation, Title VII discrimination and retaliation, and wrongful discharge in violation of public policy, the *Eitel* factors of the merits of Plaintiff's substantive claims and the sufficiency of the complaints warrant in favor of default judgment.

### iii.  Sum of Money at Stake

This factor balances "the amount of money at stake in relation to the seriousness of Defendant's conduct." *PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1176 (C.D. Cal.

2002). "Default judgment is disfavored where the sum of money at stake is too large or unreasonable in relation to defendant's conduct." *Vogel*, 992 F. Supp. 2d at 1012. "In determining whether the amount at stake is reasonable, courts consider a plaintiff's declarations, calculations, and other documentation of damages." *Fudy Printing Co., Ltd. v. Aliphcom, Inc.*, 2019 U.S. Dist. LEXIS 86791, at *10-11, 2019 WL 2180221, at *4-5 (N.D. Cal. Mar. 7, 2019), *report and recommendation adopted,* 2019 U.S. Dist. LEXIS 86784, 2019 WL 2180213 (N.D. Cal. Apr. 3, 2019).

Here, Gray seeks $3,939,768 in compensatory damages for back pay, front pay or future lost earnings, and emotional distress, plus a ratio of 7:1 for punitive damages, which amounts to $31,518,144 in total damages. (Mot. 53.) He provided evidence from an associate economist (Volkov Report, ECF No. 186), a vocational consultant (Bird Decl., ECF No. 185.), a psychologist (Drob Decl., ECF No. 184), and various case law to support his request for damages. Although the Court recognizes that the sum in controversy is large, Defendant's intentional racial discrimination against Gray affronts "our society's interest in combating discrimination" and "advance[ing] the goal of racial equality[.]" *Wei Zhang*, 339 F.3d at 1041. In accordance with these pillars, "[r]acial discrimination often results in large punitive awards." *Id.* (citations omitted).

### iv.  Possibility of Dispute Concerning Material Facts

The fifth *Eitel* factor considers the possibility of dispute concerning any material facts. *PepsiCo, Inc.*, 238 F. Supp. 2d at 1177. There is no possibility of a dispute concerning material facts because "[u]pon default, the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true." *TeleVideo Sys.*, 826 F.2d at 917-18 (citation omitted). Here, Gray has established a § 1981 violation, Title VII discrimination and retaliation, and wrongful discharge in violation of public policy, and therefore there is no possibility of dispute.

///

### v.  Strong Policy Favoring Decisions on the Merits

Finally, as the last factor, "[c]ases should be decided upon their merits whenever reasonably possible." *Eitel*, 782 F.2d at 1472. This preference for having decisions on the merits, however, "standing alone, is not dispositive." *Kloepping v. Fireman's Fund*, 1996 U.S. Dist. LEXIS 1786, at *10, 1996 WL 75314, at *3 (N.D. Cal. Feb. 13, 1996). This factor usually warrants in the defendant's favor, as it does here. (Mem. Decision 12, ECF No. 138.) Nevertheless, the weight of the other *Eitel* factors weighs in Plaintiff's favor such that entry of default judgment is appropriate.

Therefore, after weighing the *Eitel* factors, the Court concludes that entry of default judgment is appropriate.

### B.  Damages

With liability established, the Court now turns to the issue of calculating damages. Gray requests actual and punitive damages amounting to $31,518,144. (SAC 7, 51; Title VII Compl. 9.)

In his motion, Gray notes that he primarily seeks damages pursuant to § 1981 "because all relevant categories of damages are available under this cause of action, and any damages available under his Title VII or common law claims would be duplicative." (Mot. 19.) Additionally, "[t]here is no statutory cap on damage awards available for § 1981 claims" whereas Title VII imposes caps on the amount of compensatory and punitive damages. *Pavon v. Swift Transp. Co.*, 192 F.3d 902, 910 n.2 (9th Cir. 1999). Pursuant to Gray's request, the Court will address the following damages within the context of § 1981 unless stated otherwise.

Section 1981 "affords a federal remedy against discrimination in private employment on the basis of race. An individual who establishes a cause of action under § 1981 is entitled to both equitable and legal relief, including compensatory and, under certain circumstances, punitive damages." *Sethy v. Alameda Co. Water Dist.*, 545 F.2d 1157, 1160 (9th Cir. 1976) (quoting *Johnson v. Ry. Express Agency*, 421 U.S. 454, 460 (1975)); *see* 42 U.S.C. §1981a(a)(1). The Court will

20

address back and front pay, future lost earnings, emotional distress damages, and finally punitive damages.

### i.   Back Pay and Front Pay

Title VII and § 1981 authorize back pay and front pay. *Dema v. Allegiant Air, LLC*, No. CV-14-00968-PHX-SPL, 2017 U.S. Dist. LEXIS 234731, at *6, 2017 WL 5983788, *2 (D. Ariz. Mar. 30, 2017) (first citing 42 U.S.C. § 2000e-5(g); then citing 42 U.S.C. § 1981a; and then citing *Carey v. Piphus*, 435 U.S. 247, 267 (1978)).

### a.  Back Pay Amount

Back pay is calculated "by measuring the difference between actual earnings for the period and those which [the plaintiff] would have earned absent the discrimination by defendant." *Gotthardt v. AMTRAK*, 191 F.3d 1148, 1158 (9th Cir. 1999) (citations omitted). Generally, backpay is computed "from the date of the discriminatory act until the date of final judgment." *Thorne v. City of El Segundo*, 802 F.2d 1131, 1136 (9th Cir. 1986) (citations omitted). An award of fringe benefits may also be appropriate if the plaintiff would have received them but for the discrimination. *Hutchins v. DirecTV Customer Serv.*, No. 1:11-CV-422-REB, 2014 U.S. Dist. LEXIS 99683, at *46, 2014 WL 3572045, at *18 (D. Idaho July 21, 2014); *accord Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 608 (6th Cir. 2018); *EEOC v. Accurate Mech. Contractors, Inc.*, 863 F. Supp. 828, 837 (E.D. Wis. 1994). "[B]ack-pay awards are taxable . . . [a]nd a lump-sum award will sometimes push a plaintiff into a higher tax bracket than he would have occupied had he received his pay incrementally over several years." *Clemens v. CenturyLink Inc.*, 874 F.3d 1113, 1116 (9th Cir. 2017) (citation omitted). A court may elect to "gross up" an award of damages "to compensate for increased income-tax liability resulting from [a plaintiff's] receipt of his back-pay award in one lump sum." *Id.* at 1115. "[T]he decision to award a gross up—and the appropriate amount of any such gross up—is left to the sound discretion of the district

court." *Id.* at 1117. Because a prevailing plaintiff is not "presumptively entitled to an additional award to offset tax consequences[,]" the plaintiff bears the burden of proving the propriety of such an award. *Id.* (citations omitted).

Here, Gray is seeking backpay in the amount of his annual salary of $155,000.00 along with the fringe benefits of one meal a day and housing from when he stopped receiving his salary and housing (May 2019) through the anticipated date of final judgment (November 1, 2022). (Mot. 20-21.) In regards to housing benefits, Tim Goodwin, a Saipan real estate broker with over thirty years of experience, values the living accommodations IPI provided Gray at $600 a month. (Goodwin Decl. 1-2, ECF No. 182.) In regards to the daily meals, Nik Volkov, a forensic economist Gray hired to determine the economic damages incurred, estimated a meal to be $12 in Saipan and 240 meals to be provided each year (260 working days a year minus 20 days of vacation). (Volkov Report 12-13, ECF No. 186.) Further, Volkov subtracted Gray's actual 2019-2021 earnings and projected 2022 earnings from his estimate for backpay. (*Id.* at 2.) Volkov calculated the backpay based on the total after-tax past damages that he "grossed up" to ultimately conclude that the "total tax-neutralized damages that include back pay only amount to $464,083." (*Id.* at 14.)

IPI raises two arguments to limit Gray's backpay: first, Gray's position would have ceased to exist in January 2019 "like essentially all other employees in the company's hotel operations function[;]" and second, IPI closed its hotel and business operations in March 2020 due to the COVID-19 pandemic, thereby creating a non-discriminatory reason for terminating Gray and limiting damages (if any) from May 2018 through March 2020. (Opp'n 15-16.) Gray argues that IPI has waived its ability to raise these arguments because it is in default. (Reply 6.) However, as previously explained, IPI can raise arguments as to whether its discriminatory conduct was the cause of Gray's damages, but it must establish such defenses by clear and convincing evidence.

As to the first argument, IPI asserts that Gray would have been terminated anyway for non-discriminatory economic reasons because he "submitted no evidence in the record that he would have been terminated in January 2019—along with the other remaining members of IPI's hotel operations[.]" (Opp'n 10-13.) The Court considers this argument not to rebut the finding of liability but to the extent that it limits the damages Gray should be awarded. "A wrongfully terminated employee is not entitled to back pay for a period when he or she would not have been on the job in any event for a reason unrelated to the unlawful conduct of the employer" but "the party seeking to limit its liability for back pay . . . bears the burden of establishing by clear and convincing evidence the date on which plaintiff's employment would have terminated." *Ackerman*, 643 F. Supp. at 854 (citations omitted). If an employee's position has been eliminated, back pay may be reduced if the employer can prove "that the discharged employee would not have been considered for another position when his own position was eliminated." *Lavin v. Bon Appetit Mgmt. Co.*, No. C98-199D, 1998 U.S. Dist. LEXIS 21453, at *6 n.1 (W.D. Wash. July 10, 1998) (citation omitted); *accord Holland v. Gee*, 677 F.3d 1047, 1066 n.9 (11th Cir. 2012); *Blackburn v. Martin*, 982 F.2d 125, 129 (4th Cir. 1992). Part of the rationale for imposing this obligation is that "[p]ermitting a reduction in force, however legitimate, to eliminate any responsibility on the employer's part to find comparable work for a successful plaintiff nullifies [a finding of liability] and takes from the court its obligatory power to provide the plaintiff with the most complete relief possible." *Glymph v. District of Columbia*, 374 F. Supp. 2d 219, 226 (D.D.C. 2005).

While IPI has presented evidence that indicates Gray's position was extinguished as there was no work for him to do and another individual assumed his responsibilities (Don Browne Dep. Tr., ECF No. 112-1 at 4; Magdalena P. Attao Dep. Tr., ECF No. 112-2 at 3), it has not met its burden to prove that it ceased operations in general or that Gray was considered for other positions within IPI. *See Lavin*, 1998 U.S. Dist. LEXIS 21453, at *6 n.1. Additionally, IPI's contention that

23

there was no work for Gray to complete when he was terminated in January 2019 is negated by its employment of fifty-nine hotel operations employees as of January 2020 (ECF No. 204-9).

Second, IPI argues that because it closed its operations in March 2020 in light of the COVID-19 pandemic, Gray's back pay should be awarded only through March 2020 and front pay is inappropriate. In support, IPI presents the declaration of Redie Dela Cruz, a senior advisor (HR) for IPI who revealed at the hearing that she has since been terminated "as IPI is unable to pay [her] salary[,]" and stated that because of the pandemic, IPI furloughed about 98% of its employees, has not had casino or hotel operations since March 2020, and currently has less than ten employees. (First Dela Cruz Decl. ¶¶ 4-5, 7.)

Other courts have found that back pay should only be awarded to the date when an employer's business closes. *See Richardson v. Rest. Mkt. Assocs.*, Inc., 527 F. Supp. 690, 696 n.1 (N.D. Cal. 1981); *Helbling v. Unclaimed Salvage & Freight Co.*, 489 F. Supp. 956, 963 (E.D. Pa. 1980) (calculating back pay from date of injury until defendant store closed and job ceased to exist).

The Court finds that IPI has proved by clear and convincing evidence that although Gray was unlawfully terminated in January 2019, Gray's position would have been terminated in March of 2020 because of the COVID-19 pandemic. The Governor of the Commonwealth of the Northern Mariana Islands ("CNMI") issued emergency stay-at-home orders in March 2020. (First Dela Cruz Decl. ¶ 4, ECF No. 200-1.) The pandemic is an unforeseen circumstance that limits IPI's liability as it became the predominant reason for Gray's termination, as opposed to IPI's intentional discrimination. To date, IPI has not resumed operations. (Second Dela Cruz Decl. ¶ 30.)

As for grossing up, the Court exercises its discretion to permit grossing-up of the lump sum as Gray, through Volkov, has provided a number that is certain and reasonable to account for the inherent inequity of receiving a lump sum that pushes him into a higher tax bracket than he would have been if he received his salary regularly but for the discrimination and retaliation. *Cf. Clemens*,

874 F.3d at 1117 (recognizing that a gross up is not appropriate when there is "difficulty in determining the proper gross up").

Gray requests a total of $464,083 in grossed up back pay for 42 months, the time frame of May 2019 up to November 1, 2022, the presumed date of judgment. (Volkov Report 3, ECF No. 186; Mot. 21.) The Court will instead use the above-designated time frame of May 2019 to March 2020, which amounts to 11 months of back pay. Using Gray's figures to provide a monthly figure and the 11 months of back pay that he is entitled to, the Court awards Gray $121,545.55 in grossed-up back pay.

**b. Front Pay**

When reinstatement is not available, such as when there is hostility between the plaintiff and defendant, front pay is an appropriate substitute. *Pollard v. E. I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001) (citations omitted). Front pay is defined as "money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement." *Id.*

Both parties agree that of the two options, front pay is appropriate as reinstatement is not tenable. (Mot. 23; Opp'n 16.) "[A]ny award of front pay is limited by the estimated remaining tenure plaintiff would have enjoyed with his company absent the discriminatory conduct. When the defendant company has ceased to do business before judgment, plaintiff necessarily would have been discharged with the rest of the work force; thus, reinstatement was impossible and front pay inappropriate." *Sandlin v. Corp. Interiors, Inc.*, 972 F.2d 1212, 1215 (10th Cir. 1992); *see also Teutscher v. Woodson*, 835 F.3d 936, 951 (9th Cir. 2016) (citation omitted) (An award of front pay "turns in part on the permanency of the position that was held by the plaintiff and the possibility that his position would have been eliminated through consolidation for a non-retaliatory reason."). *Contra Glymph*, 374 F. Supp. 2d at 227 ("Because the reduction in force increases, rather than

diminishes, plaintiff's right to reinstatement to a comparable position, the [employer] can only escape reinstatement if it can establish that it in fact offered plaintiff a position that was comparable, but that she declined to take it."). Here, because IPI has established that Gray would have been fired in March 2020 like nearly all the other employees of the company because of the pandemic, Gray is not entitled to reinstatement or front pay.

### ii.    Lost Future Earnings

The Court analyzes Gray's claim for lost future earnings pursuant to Title VII, which authorizes damages for lost future earnings. *See Williams v. Pharmacia, Inc.*, 137 F.3d 944, 952 (7th Cir. 1998); *accord United States v. City of New York*, 897 F. Supp. 2d 30, 48 (E.D.N.Y. 2012).

> Whereas front pay compensates the plaintiff for the lost earnings from her old job for as long as she may have been expected to hold it, a lost future earnings award compensates the plaintiff for the diminution in expected earnings in all of her future jobs for as long as the reputational or other injury may be expected to affect her prospects.

*Williams*, 137 F.3d at 954. Lost future earnings are nonpecuniary injuries analogous to "injury to professional standing" and to "injury to character and reputation[.]" *Id.* at 952. The Ninth Circuit has reversed a windfall based on an overlap of front pay and lost future earnings. *See Teutscher*, 835 F.3d at 958. Similarly, the Seventh Circuit distinguished the two and noted that the one-year front pay award compensated the plaintiff for the immediate effects of the unlawful termination. *Williams*, 137 F.3d at 953. The Seventh Circuit further explained that a court's inquiry on front pay terminates "at the point at which the plaintiff finds employment comparable or superior to her old job." *Id.* at 954. Lost future earnings do not have a similar limitation on duration because "reputational or other injury that causes the diminution in expected earnings can stay with the employee indefinitely." *Id.* Here, Gray's reputational harm can be considered under lost future earnings because the Court denied his request for front pay.

The requests Gray seek are in any event more akin to lost future earnings than front pay. Gray seeks front pay until retirement at the age of 62.68[7] (which is about thirteen years) because he will not be able to catch up to his IPI salary before retirement as the lawsuit, and IPI's discrimination and retaliation have reduced his employability. (Mot. 23-24, 28.) Gray retained a vocational rehabilitation counselor, Anthony K. Bird, who concluded that "[a]s a result of his termination by and legal action against IPI, Mr. Gray will not be able to find employment commensurate with his position at IPI[.]" (Bird Decl. 2 ¶ 9, ECF No. 185.) However, Bird estimates that Gray could find a position in the hotel industry that pays $77,150 a year after a thorough job search in the mainland United States[8] for 18-21 months.[9] (*Id.* ¶ 35) Gray's proffered "front pay award was calculated by assuming that Gray would continue earing his IPI salary and his meal/housing benefits (but not insurance or travel benefits) until he is expected to stop working." (Mot. 28.) However, this request is more appropriately categorized under loss of future earnings. *See Williams*, 137 F.3d at 954 ("[L]ost future earnings award compensates the plaintiff for the diminution in expected earnings in all of her future jobs for as long as the reputational or other injury may be expected to affect her prospects.") Therefore, the Court applies Gray's arguments for front pay to his request for lost future earnings. Volkov mitigated the front pay figure by Gray's future earnings at the rate of $77,150 beginning March 2024 (eighteen months from Bird's opinion) with an expected growth rate using the employment cost index prepared by the U.S. Congress,

---

[7] To arrive at this work life expectancy figure, Volkov considered Gray's education level, activity status in the labor market, age, and sex. (Volkov Report 4.)

[8] "'[A] wrongfully discharged employee is expected to seek only new employment that is *substantially equivalent to* the position lost' and 'is not required to seek or retain a job more onerous than the job from which he or she was discharged[.]'" *NLRB v. Lucky Cab Co.*, 818 F. App'x 638, 641 (9th Cir. 2020) (citation omitted). Moreover, the employee is not required to seek employment so remote that it would require a move. *See id.* at 641-42 (limiting search of employment to Las Vegas area). Here, Gray is not required to seek employment outside of Saipan. Nevertheless, IPI did not assert, let alone meet its burden, to show that Gray failed to mitigate. *See id.* at 640.

[9] Although more than 18-21 months has passed since Gray's termination, Gray first searched for a job in Saipan (as opposed to the United States mainland) for a slew of reasons. (Gray Decl. ¶ 70.)

27

Congressional Budget Office. (Volkov Report 5, 12.) Volkov also mitigated the estimate with Gray's current income of $36,770 with appropriate growth rate through February of 2024. (*Id.* at 11-12.) After the aforementioned mitigations, Gray seeks $1,475,685 in lost future earnings. (*See* Mot. 28-29, 31.)

IPI's discrimination has impacted Gray's employability. He has expended considerable effort in seeking a position in hotel management, both in Saipan and in the continental United States, as detailed above. (Gray Decl. 21-23.) He has "either formally applied for a position, sent in [his] resume, or at least informally inquired about a job at every hotel on Saipan."[10] (*Id.* ¶ 72.) Prospective employers that have interviewed Gray have questioned him about this instant litigation. (Gray Decl. ¶ 79.) Bird explained that Gray's employability has decreased because there are dozens of other candidates with blemish free reputations. (Bird Decl. ¶ 6-8.) Thus, Gray's employability has been impacted because of this lawsuit as reflected by his demonstrated inability to obtain a job of similar stature to the one he had at IPI despite his thorough search for one.[11] To calculate his lost future earnings, the Court applies the methodology Gray used to support his request for front pay, which was reduced by his anticipated future income at a lower-paying hospitality position. Even though front pay is inappropriate because Gray would have been terminated due to the pandemic and independent of IPI's discrimination and retaliation, the harm to Gray's reputation still exists

---

[10] IPI distinguishes several of cases Gray cites to because unlike the plaintiffs in those cases, "Gray's skills in hotel operations are not so specialized as to render him unable to find a comparable position." (Opp'n 17.) The Court recognizes that the skills of a hotel manager are not as niche as that of a superintendent of train operations as outlined in *Padilla v. Metro-N. Commuter R.R.*, 92 F.3d 117, 126 (2d Cir.1996). But in *Padilla*, the court also noted that there was no indication that the plaintiff would be able to obtain one of the other three superintendent of train operation positions *in the New York area*. *Id.* at 126. Gray has stated that he has applied to or inquired with every hotel in Saipan and was similarly unable to find comparable employment.

[11] To establish that the plaintiff has failed to mitigate damages, the defendant has to prove "that, based on undisputed facts in the record, during the time in question there were substantially equivalent jobs available, which [the plaintiff] could have obtained, *and* that [the plaintiff] failed to use reasonable diligence in seeking one." *Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1497 (9th Cir. 1995) (citation omitted). As IPI did not even raise the argument that Gray failed to mitigate his damages, it has not met its burden to prove such.

regardless of the pandemic. He still has a demonstrated difficult time obtaining a job because of his harmed reputation.

However, Gray's request for $1,475,685 in lost future earnings is inappropriate in light of Title VII's statutory cap. Although Title VII does not impose a cap on front pay, "lost future earnings are subject to Title VII's damages cap[.]" *Jensen v. W. Jordan City*, 968 F.3d 1187, 1199-1200 (10th Cir. 2020). Title VII's damages cap "applies only to remedies that were not available under the pre-1991 version of the Civil Rights Act[,]" which include "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses[.]" *Id.* (quoting 42 U.S.C. § 1981a(b)(3)). The Tenth Circuit "agree[d] with the Seventh Circuit's analysis in *Williams* and conclude[d] that [a] lost future earnings award falls within the category of 'other nonpecuniary losses.'" *Id.* at 1200.

Title VII's statutory cap varies depending upon the number of employees an employer has "in the current or preceding calendar year[.]" *See* 42 U.S.C. § 1981a(b)(3). Current calendar year "refer[s] to the time period of the discrimination." *Hernández-Miranda v. Empresas Diaz Massó, Inc.*, 651 F.3d 167, 170 (1st Cir. 2011); *accord Depaoli v. Vacation Sales Assocs., LLC*, 489 F.3d 615, 622 (4th Cir. 2007); *Vance v. Union Planters Corp.*, 209 F.3d 438, 446 (5th Cir. 2000); *Cassella v. Mineral Park, Inc.*, No. CV 08-1196-PCT-MHM, 2010 U.S. Dist. LEXIS 82240, at *1 n.1, 2010 WL 2889881, at *1 n.1 (D. Ariz. July 20, 2010). For employers with more than 500 employees, awards are limited to $300,000 for employers with more than 500 employees. 42 U.S.C. § 1981a(b)(3)(D).

In March 2018, IPI had 1,600 employees (ECF No. 178-1 at 41-42, 48 (Lucy Guo's CW-1 Petition signed by IPI's Assistant Vice President – Human Resources attesting to the current number of IPI employees).) During this time, IPI had discriminated and/or retaliated against Gray by reducing his material responsibilities and ostracizing him. (*See* Gray Decl. ¶ 45.) As such, Title

VII's cap of $300,000 for employers with more than 500 employees applies. The Court notes that the cap only applies to the award for lost future earnings because all other damages are awarded under § 1981, which does not have a statutory cap, *Pavon*, 192 F.3d at 910 n.2. Thus, while the Court acknowledges that $1,475,685 is an appropriate approximate of Gray's tarnished reputation and inability to obtain a similar job to the one he had with IPI, the Court is constrained by Title VII's statutory cap and thus awards Gray $300,000 in lost future earnings.

### iii.    Emotional Distress

Section 1981 and Title VII authorize emotional distress damages. *Barefield v. Chevron U.S., Inc.*, No. C86-2427 TEH, 1997 U.S. Dist. LEXIS 237, at *95, 1997 WL 9888, at *28 (N.D. Cal. Jan. 2, 1997), *aff'd sub nom. Barefield v. Chevron U.S.A., Inc.*, 156 F.3d 1235 (9th Cir. 1998); 42 U.S.C. § 1981a(b)(3) (limitations). The Ninth Circuit requires neither objective evidence of emotional distress, nor "evidence of economic loss or mental or physical symptoms to obtain compensatory damages for emotional distress." *Alozie v. Ariz. Bd. of Regents*, 562 F. Supp. 3d 203, 219 (D. Ariz. 2021) (first citing *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 513 (9th Cir. 2000); and then citing *Johnson v. Hale*, 13 F.3d 1351, 1352 (9th Cir. 1994)). The analysis of emotional distress focuses on "the qualitative harm suffered by [the plaintiff]," as well as "[t]he severity or pervasiveness of the conduct . . . insofar as it provides probative evidence from which a [fact finder] may infer the nature and degree of emotional injury suffered, but direct evidence of the injury is still the primary proof." *Velez v. Roche*, 335 F. Supp. 2d 1022, 1038 (N.D. Cal. 2004) (citations omitted).

Gray requests $2 million in damages for his severe emotional distress. (Mot. 37.) As evidence of his emotional distress, Gray provides declarations from himself (ECF No. 178), his friend Roger Pich (ECF No. 179), his ex-girlfriend and mother of his child, Reyshell Anne Avellanoza (ECF No. 180), and psychologist Sanford L. Drob, Ph.D. (ECF No. 184). Before IPI's

discrimination and retaliation, Avellanoza described Gray as a once "joyful man, the life of the party, who was always positive and had a big smile for everyone; the generous friend and loving father" who "became a broken man—he lost the career that he loves, but also lost his self-confidence, and his financial, emotional and mental health." (Avellanoza Decl. ¶ 17.) Gray and Avellanoza "separated around January 2018 because [Gray] was just too hard to get along with. He was not the man that [she] had first met." (*Id.* ¶ 15.) Dr. Drob found that Gray "continues to experience clinically significant depression, anxiety and other psychological symptoms, as well as a protracted and ongoing crisis in personal identity, self-regard, and self-worth." (Drob Decl. ¶ 49.) To support his request for $2 million for emotional distress, Gray provides several cases as comparators. The Court details the cases it finds especially pertinent as "comparable cases provide a rough benchmark." *Velez*, 335 F. Supp. 2d at 1039.

Gray cites to *Diaz v. Tesla*, 598 F. Supp. 3d 809, 816 (N.D. Cal. 2022), *motion to certify appeal denied,* No. 17-CV-06748-WHO, 2022 WL 2046827 (N.D. Cal. June 7, 2022) to signify his entitlement to "emotional distress damages greater than the $1.5 million awarded to Diaz. (Mot. 38.) In *Diaz v. Tesla, Inc.*, the court remitted a jury award for emotional harm to $1.5 million as Plaintiff Diaz's "emotional harm still warrants a relatively high award." 598 F. Supp. 3d at 835. Diaz's coworkers and supervisors frequently used the "n-word." *Id.* He was subjected to names like monkey, phrases like "go back to Africa," signs like swastikas, and objects including a monkey with a noose around its neck. *Id.* Diaz's verbal complaints were never addressed. *Id.* As a result of the discrimination, Diaz "stopped eating, stopped sleeping, stopped having intimate relations with his wife, and withdrew from involvement in his child's life[,]" which led to a finding of "severe emotional distress." *Id.* at 835-36 (citation omitted). Diaz worked for the defendant for nine months; and once he stopped working for it, his emotional harm greatly reduced. *Id.* at 836.

Additionally, Gray cites to *Passantino* to substantiate his claim for $2 million in emotional distress damages as Passantino was awarded the equivalent of $1.72 million today and Gray "suffered emotional distress that is more severe than did Passantino[.]" (Mot. 40.) In *Passantino*, the Ninth Circuit affirmed an award of $1,000,000 in compensatory emotional distress damages in a gender discrimination, retaliation case. 212 F.3d at 504, 514. Plaintiff Passantino worked in a "good old boy system that allowed discrimination" with a sexist supervisor that used terms like "PMS," "menstrual," and "dragon lady" when referring to women. *Id.* at 500. After voicing her complaints about the gender discrimination, Passantino suffered a range of retaliatory acts for four years.[12] *See id.* at 500-02. Because of the retaliation, Passantino suffered substantial anxiety, rashes, and stomach problems. *Id.* at 513.

Gray also cites to *Harper v. City of Los Angeles*, 533 F.3d 1010 (9th Cir. 2008) as he asserts he experienced emotional distress similar to those plaintiffs. (Mot. 40.) In *Harper*, Ninth Circuit affirmed three $5,000,001 awards for emotional distress damages for three police officers who were wrongfully criminally investigated. 533 F.3d at 1028-29. "Each officer testified about the adverse physical and emotional effects of the media attention and his loss of reputation" such as high blood pressure, paranoia, increased drinking, anxiety, back and neck pain, hospitalization for chest pains, and weight gain. *Id.* at 1029. Additionally, the officers "testified as to the adverse effect the experience had on their personal and professional lives" such as being forced to work lower-paying jobs or a desk job because of the publicity. *Id.*

IPI counters that Gray's cited cases are inapposite and proffers *Velez* as a more appropriate comparator where the plaintiff, Dr. Velez, was awarded $300,000 for her emotional distress. (Opp'n 15.) Dr. Velez was subjected to a hostile work environment for fifteen months. *Velez*, 335 F. Supp.

---

[12] IPI asserts that Passantino suffered eighteen years of discrimination. (Opp'n 20 (citation omitted).) However, the case is not clear as to how long Passantino was discriminated against before the retaliation. *See Passantino*, 212 F.3d at 499-500.

2d at 1037. Dr. Velez's coworkers consistently made inappropriate remarks with her present such as "did you check out the boobs on bed two" or a comment about a woman's promiscuity. *Id.* at 1032 n.2 (citation omitted).  Consequently, Dr. Velez experienced more than "garden variety" emotional distress as she suffered clinical depression and mental anguish; and she felt betrayed and lied to, and that while she used to have a high energy level[,] she [now] could barely get anything done and stopped participating in activities because she was emotionally exhausted." *Id.* at 1040-41. Notably, the damages in *Velez* were "reduced to $300,000 to reflect Title VII's statutory cap." *Id.* at 1037. Here, Gray sues under both Title VII and § 1981. As explained above, § 1981 does not have a statutory cap limiting the damages. Therefore, *Velez* is less pertinent to the instant case.

Having considered the above-referenced cases, the Court concludes a $2 million award sought by Gray for emotional distress is excessive. Whereas Diaz was subjected to emotional distress for nine months, which greatly reduced once he stopped working for the defendant, Gray has suffered emotional distress for years, and continues to suffer to this day. However, the discrimination in *Diaz* involved more egregious conduct, including nooses and swastikas. On the other end, *Velez* is less apposite because that case was tempered by the Title VII statutory cap, and the emotional distress that Gray suffered is more extensive. Based on the case law and the facts of this case, the Court awards Gray $1,000,000 in emotional distress damages.

### iv.    Punitive Damages

Gray may recover punitive damages under Title VII, § 1981, or wrongful discharge in violation of public policy. 42 U.S.C. § 1981a(a)(1); *Woods v. Graphic Commc'ns*, 925 F.2d 1195, 1204–06 (9th Cir. 1991) (citation omitted) (§ 1981); *Freund v. Nycomed Amersham*, 347 F.3d 752, 760 (9th Cir. 2003) (citation omitted) (wrongful discharge).  Under Title VII, "[p]unitive damages are limited . . . to cases in which the employer has engaged in intentional discrimination and has done so 'with malice or with reckless indifference to the federally protected rights of an aggrieved

individual.'" *Koldstad v. Am. Dental Ass'n*, 527 U.S. 526, 529-30 (1999) (quoting 42 U.S.C. § 1981a(b)(1)). However, egregious conduct is not required for punitive damages. *Id.* at 535; *see also Wei Zhang*, 339 F.3d at 1041. The Supreme Court clarified that at a minimum, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Koldstad*, 527 U.S. at 536.

As discussed above, IPI has defaulted and therefore has already been found to have engaged in intentional discrimination. To the extent that IPI argues that Gray was not discriminatorily terminated as he was fired as part of a cost-cutting measure, (Opp'n 23), it is precluded from doing so. *See In re Estate of Marcos Human Rights Litig.*, 978 F.2d 493, 495 n.2 (9th Cir. 1992) (declining to consider affirmative defense of statute of limitations "which was waived by virtue of [the defendant's] default"). From a policy standpoint, it would be unfair to allow a party against whom default has been entered against to take a second bite of the apple to argue liability, including a purported legitimate nondiscriminatory reason as a part of the classic burden-shifting scheme the Supreme Court outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), at the motion for default judgment phase. To be clear, IPI discriminated and retaliated against Gray when it terminated him in January 2019.

The evidence also demonstrates that IPI discriminated even though it knew that terminating Gray would violate federal law. Mark Brown told Gray that IPI's owner, Mr. Ji, told Brown to fire Gray and Brown responded that it would be illegal to fire a U.S. citizen and give his job duties to a CW-1 worker. (Gray Decl. ¶¶ 52-53.) Additionally, IPI's Senior Vice President of Operations at the time, Donald Browne, acknowledged that IPI was discriminating against Gray in violation of federal law regarding Gray's unsuccessful applications of vice president of hotel operations and assistant vice president. (*Id*. ¶ 24.) In reference to an email where Browne noted a different "foreign worker [was] selected over an equally or more highly qualified US worker[,]" Butcher, IPI's

counsel, acknowledged that IPI "ha[d] a similar situation with Joshua Gray." (ECF No. 178-2 at 37.) Moreover, IPI could not have reasonably believed that terminating Gray was lawful as it previously had notice of the federal employment discrimination laws via Gray's EEOC complaint filed in July 2016, which the parties settled. (Gray Decl. ¶¶ 34, 41-42.) In its own Environmental, Social and Governance Reports from 2017 and 2018, IPI even recognized "the importance of nondiscrimination" as it boasted it sent its management to EEOC seminars and claimed it "compl[ies] with all applicable EEOC regulations, and prohibit[s] any unlawful discrimination." (ECF No. 183-1 at 56, 81). Therefore, punitive damages are appropriate in this case.

The goals of punitive damages are to punish unlawful conduct and deter its repetition. *Swinton v. Potomac Corp.*, 270 F.3d 794, 819 (9th Cir. 2001) (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 568 (1996)). The Supreme Court articulated three "guideposts" in reviewing punitive damages: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003).

In assessing reprehensibility, the first and "most important" guidepost, courts must consider the following subfactors: (1) whether the harm was physical as opposed to economic, (2) whether there was clear indifference to the health or safety of others, (3) whether the target had financial vulnerability, (4) whether the conduct was repeated or isolated, and (5) whether the harm was the result of intentional malice or mere accident. *Id.* at 419 (citation omitted). A review of the facts demonstrates that IPI's misconduct was reprehensible based on these factors. First, "physical harm . . . encompasses psychological harm[.]" *Yowan Yang v. ActioNet, Inc.*, No. CV1400792ABPJWX, 2017 WL 2117028, at *15 (C.D. Cal. Jan. 23, 2017) (citation omitted). Here, Gray's psychological

harm, which had physical manifestations, is detailed at great lengths above and evidenced by his own declaration and the declarations of a psychologist, his friend, and his ex-girlfriend. Second, "emotional injuries are on a continuum of harm affecting at least the 'health and safety of others[.]'" *Miller v. Equifax Info. Servs., LLC*, No. 3:11-CV-01231-BR, 2014 U.S. Dist. LEXIS 69450, at *11, 2014 WL 2123560, at *4 (D. Or. May 20, 2014). IPI acted with clear indifference to Gray's emotional health when Gray was referred to as "fat black man" and when it discriminatorily and retaliatorily terminated him. Third, Gray was financially vulnerable as he had moved thousands of miles from the United States mainland to the CNMI for his job with IPI. *See Yowan Yang*, 2017 WL 2117028, at *15 ("As to Plaintiff's financial vulnerability, . . . Plaintiff relied on the income from his employment with Defendant as his only source of income."). Fourth, IPI's discriminatory conduct was not an isolated incident limited to just Gray. For example, Danny Ewing was told by his IPI supervisor not to apply "for jobs posted on the CNMI Job Vacancy Announcement ("JVA") website because those jobs were to be filled by Chinese." (Ewing Decl. ¶ 7, ECF No. 181). Browne also acknowledged that "a foreign worker [was] selected over an equally or more highly qualified US worker[,]" Danny Ewing. (ECF No. 178-2 at 37.) Don Hallmark, IPI's Vice President of Slot Operations, observed a pattern of replacing Caucasian and Black workers with Asian employees. (Gray Decl. ¶ 64; ECF No. 178 at 41.) Fifth, it is clear that IPI's discriminatory and retaliatory termination of Gray was intentional, not accidental. For example, IPI's owner, Mr. Ji, told Brown to fire "the fat black guy" so that Lucy Guo could manage hotel operations, despite Brown's warning that it would be illegal to fire a U.S. citizen and give his job duties to a CW-1 worker. (Gray Decl. ¶¶ 52-53.) Furthermore, the racial discrimination IPI subjected Gray to is deplorable as "[f]reedom from discrimination on the basis of race or ethnicity is a fundamental human right . . . and the intentional deprivation of that freedom is highly reprehensible conduct." *Wei Zhang*, 339 F.3d at 1043.

Punitive damages must also bear a "reasonable relationship" to compensatory damages under the second guidepost. *BMW*, 517 U.S. at 580. Caselaw reveals that although there is no bright line ratio in determining punitive damages, "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *State Farm*, 538 U.S. at 425. The Supreme Court suggested that punitive damages four times the amount of actual damages may be constitutional despite being close to excessive. *Pac. Mut. Life Ins., Co. v. Haslip*, 499 U.S. 1, 22 (1991). Where compensatory damages are substantial, "a lesser ratio" of punitive damages, "perhaps only equal to compensatory damages," would be appropriate. *State Farm*, 538 U.S. at 425. However, the Supreme Court has similarly maintained that where nominal amounts for compensatory damages are awarded, punitive damages may be enlarged. *See BMW*, 517 U.S. at 582 ("[L]ow awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages."); *see, e.g., Bryant v. Jeffrey Sand Co.*, 919 F.3d 520, 528 (8th Cir. 2019) (finding jury award of $250,000.00 in punitive damages in view of jury award of $1.00 in compensatory damages proportionate to defendant's reprehensible conduct in § 1981 civil rights claim for racially hostile work environment and retaliatory termination); *Swinton*, 270 F.3d at 818-19 (upholding $1 million award of punitive damages against a $35,612 award in compensatory damages in § 1981 civil rights claim for racial harassment).

Gray requests punitive damages in a ratio of 7:1 to his other awarded damages. (Mot. 46.) Gray's requested compensatory damages total almost $4 million and awarded compensatory damages total almost $1.5 million are substantial such that "a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm*, 538 U.S. at 425. Nevertheless, the Ninth Circuit has noted that "[r]acial discrimination often results in large punitive damage awards" after noting the gravity of discrimination and "the importance of

37

our society's interest in combating discrimination[.]" *Wei Zhang*, 339 F.3d at 1043 (citations omitted). Courts have awarded punitive damages with high ratios in employment discrimination cases. *See Swinton*, 270 F.3d at 818-20 (ratio of 28:1 with punitive damages at $1,000,000 and compensatory damages at $36,500); *Wei Zhang*, 339 F.3d at 1045 (awarding compensatory damages at $360,000 and punitive damages at $2.6 million based on a ratio of 7:1); *Diaz*, 2022 WL 1105075, at *1 (awarding compensatory damages of $13.5 million and punitive damages at $1.5 million based on a ratio of 9:1). As discussed above, Gray suffered racial discrimination at IPI similar to the discrimination the plaintiff in *Diaz* suffered while at Tesla. IPI's discrimination is more reprehensible than that in *Swinton* as there the Ninth Circuit noted that the defendant's reprehensibility was based not on the racist jokes "but rather the action—or, rather, inaction—of the company's proxies in response to them." 270 F.3d at 817. Here, the actions of IPI's management and owners were the source of the discrimination.

Another consideration is that the Ninth Circuit remarked "the $300,000 statutory limitation on punitive damages in Title VII cases was an appropriate benchmark for reviewing § 1981 damage awards, even though the statute did not apply to § 1981 cases[,]" *Bains LLC v. Arco Prods. Co.*, 405 F.3d 764, 777 (9th Cir. 2005); however, it "hasten[ed] to add that Congress has not seen fit to impose any recovery caps in cases under § 1981[.]" *Swinton*, 270 F.3d at 820.

After considering Supreme Court and Ninth Circuit precedent, as well as other district court's opinions, the Court concludes that the high compensatory award in this case warrants a lower ratio than sought by Plaintiff Gray and instead awards a ratio of 3:1 for punitive damages.

**v.    Prejudgment and Postjudgment Interest**

Title VII authorizes prejudgment interest for backpay in order to make "persons whole for injuries suffered through past discrimination." *Loeffler v. Frank*, 486 U.S. 549, 558 (1988) (citation omitted). The trial court has discretion to award such interest. *Domingo v. New England Fish Co.*,

38

727 F.2d 1429, 1446 (9th Cir. 1984). Here, an award of prejudgment interest for the Court's award of damages is warranted in order to make Gray whole. *Cf. id.* (citations omitted) (affirming denial of prejudgment interest when "the amount of backpay is not readily determinable"). The post-judgment interest rate is "appropriate for fixing the rate for pre-judgment interest in cases such as this, where pre-judgment interest may be awarded, unless the trial judge finds, on substantial evidence, that the equities of the particular case require a different rate." *W. Pac. Fisheries, Inc. v. S.S. President Grant*, 730 F.2d 1280, 1289 (9th Cir. 1984). Because there is proffered no reason to use a different rate, prejudgment interest is imposed on Gray's backpay award at the post-judgment federal interest rate.

28 U.S.C. § 1961 requires post-judgment interest on the final judgment. Therefore, the Court awards post-judgment interest pursuant to the federal rate.

### vi.   Attorneys' Fees and Costs

"[T]he court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs" for § 1981 actions. 42 U.S.C. § 1988(b). The intent of § 1988 was to "effectuate the strong federal policy in fully redressing civil rights violations by enabling litigants to obtain competent counsel. While the award is not to be used to make the attorneys 'rich,' it must nevertheless be 'sufficient to make such representation financially attractive to highly qualified attorneys.'" *Farris v. Cox*, 508 F. Supp. 222, 224-25 (N.D. Cal. 1981) (citations omitted). In accordance with this policy, the Court awards Gray reasonable attorneys' fees and costs for bringing and prevailing in this action. Gray is to submit his attorneys' fees and costs in accordance with Federal Rule of Civil Procedure 54(d).

## V.   CONCLUSION

Plaintiff Gray has prevailed against IPI on his § 1981 racial discrimination claim, claim of wrongful termination in violation of public policy, and Title VII discrimination and retaliation

claims. Based on the foregoing reasons, the Court awards Gray the following compensatory damages: $121,545.55 in back pay, $300,000 in lost future earnings, and $1,000,000 in emotional distress damages. The total of compensatory damages amounts to $1,421,545.55. With a ratio of 3:1 of punitive damages to compensatory damages, the Court awards $4,264,636.65 in punitive damages. Therefore, the total amount of compensatory and punitive damages is $5,686,182.20 plus attorneys' fees and costs, prejudgment interest at the same rate as post-judgment interest, and post-judgment interest at the applicable federal rate. The Court directs the Clerk to enter final judgment in accordance with this Decision and Order.

IT IS SO ORDERED this 30th day of May, 2023.

_____
RAMONA V. MANGLONA
Chief Judge